UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION
_____

UNITED STATES OF AMERICA,

       Plaintiff,                               Case no. 2:22-cr-25

v.                                                 Hon. Robert J. Jonker
                                                     United States District Judge

SAMUEL OGOSHI,

       Defendant.
_____/

### DEFENDANT'S MOTION AND BRIEF FOR PRETRIAL RELEASE

The defendant, Samuel Ogoshi, through his attorney, Sean R. Tilton, Assistant Federal Public Defender, hereby respectfully requests that this Court release Mr. Ogoshi on bond pursuant to the Bail Reform Act (BRA), 18 U.S.C. § 3142, and *United States v. Salerno*, 481 U.S. 739 (1987).  Mr. Ogoshi files this motion in advance of the hearing on September 1, 2023.  Mr. Ogoshi is requesting a bond requiring that he live in a halfway house and include the bond conditions required by the Adam Walsh Child Protection and Safety Act and 18 U.S.C. § 3142(c)(1)(B), including electronic monitoring.

**Facts**

On January 17, 2023, Samuel Ogoshi was arrested at the request of the FBI in Nigeria by Nigerian law enforcement.  He was held without bail.[1]  He was not appointed

---

[1] Sections 35 and 36 of Nigeria's 1999 Constitution secures rights to bail, remaining silent and consulting with an attorney, written grounds for arrest and detention within 24 hours, appearance before a judge, and other court proceedings.  https://www.constituteproject.org/constitution/Nigeria_1999 Accessed 8/22/2023.

an attorney and denied the ability to retain one.² He did not receive the written grounds for his arrest and detention. For nearly a month, he was denied bail or a hearing before a judge. Mr. Ogoshi was interrogated by the Nigerian Economic Financial Crimes Commission (EFCC) and FBI prior to being brought before a judge or consulting with an attorney. He remained in custody without an attorney until his family was able to hire an attorney in June 2023.

On August 10, 2023, he was issued an I-94 parole document from the United States Department of Homeland Security. He was granted Significant Public Benefit Parole (SPBP) for two days, which was valid until August 15, 2023. On August 12, 2023, he was extradited from Nigeria and arrived in the Western District of Michigan on August 13, 2023. On August 14, 2023, an immigration detainer was issued by the Department of Homeland Security. He has been detained while in this country.

Mr. Ogoshi is a 22-year-old college student in his second year at Nasarawa State University studying sociology. He is a native of Nigeria and has never left the country until his extradition in this case. He does not have a passport. He has no prior arrests or convictions. He had never been in jail prior to this arrest. Mr. Ogoshi relies on his parents for financial support and does not have any assets.

Mr. Ogoshi's father is a retired member of the Nigerian military and receives a pension. Mr. Ogoshi's mother owns a small business selling soft drinks from her apartment to others in their apartment complex. The family identifies as middle class.

---

² This information was provided by Mr. Ogoshi's Nigerian attorney who was retained more than four months after his arrest.

Mr. Ogoshi's family has never traveled outside of Nigeria and does not have passports. His entire extended family lives in the Nasarawa state or Lagos, Nigeria.

Mr. Ogoshi has never used illicit drugs. As noted in the pretrial services report, he has not used alcohol in years. Mr. Ogoshi does not have a history of any mental or physical health problems.

Mr. Ogoshi and his family are Christians. They attend a local church at least three times per week (Tuesday, Wednesday, and Sunday). He has attended church for his entire life. Mr. Ogoshi's family is tight knit. They spent holidays and other special days with each other cooking local food, such as rice, semo fufu, vegetable soup, and yams.

As a child, Mr. Ogoshi was active in the church's children's choir and youth fellowship. He would spend his free time playing soccer in his neighborhood with other kids. After secondary school and prior to matriculating into college, he spent two years designing customary Nigerian clothing.

Mr. Ogoshi's family remains supportive of him. Mr. Ogoshi's mother and older brother provided the above information to defense counsel.

I. **Mr. Ogoshi objects to the government proceeding by proffer at the bond hearing.**

At the bond hearing, the government stated to defense counsel that it intends to proceed by proffer. Conducting a bail hearing by proffer is acceptable under the law and at the discretion of the district court. *United States v. Stone*, 608 F.3d 939, 948–49 (6th Cir. 2010). *See United States v. Webb,* 238 F.3d 426 (table), 2000 WL 1721060, at *2 (6th Cir. 2000) ("[T]the government may proceed in a detention hearing by proffer or hearsay.").

3

However, in this case defense counsel objects to the government proceeding by proffer and requests that the Court exercise its discretion to require testimony. Mr. Ogoshi and defense counsel object to a proffer of information because much of the evidence originates from Nigeria, and there are concerns about its reliability and accuracy. On January 17, 2023, Mr. Ogoshi was arrested by the EFCC. The next day, he was interrogated by the EFCC and required to make a written statement. He was not allowed to have an attorney. For the next three weeks, Mr. Ogoshi remained in custody without an attorney, did not appear before a judge, and was not permitted bail. On February 8, 2023, the FBI interviewed Mr. Ogoshi and his brother. Samson Ogoshi had made a written statement to the EFCC on January 24, 2023. He asked the FBI agents to review the statement. The agents said that they were aware of his EFCC statement but did not want to review it.[3] Samuel Ogoshi did not appear before a judge until after the FBI interview. He remained in custody and did not have an attorney until months later.

Nigeria is considered one of the most corrupt countries in the world.[4] Corruption in the justice system in Nigeria has resulted in the perversion of justice, wrongful convictions, and acquittals of guilty parties.[5] The abuse of detained suspects exists despite the fact that Nigeria has entrenched the right to silence in its Constitution.[6]

---

[3] FBI report 305H-DE-3580728

[4] "2022 Corruption Perceptions Index" https://www.transparency.org/en/cpi/2022 Accessed on 08/21/2023 (Nigeria ranked 150 out of 180 countries on the 2022 Corruption Perception Index).

[5] International Bar Association. "The impact of corruption on the rule of law and the effective administration of justice using Nigeria as a case study." April 28, 2023. https://www.ibanet.org/impact-of-corruption-on-rule-of-law-Nigeria#:~:text=Nigeria%20ranked%20150%20out%20of,International%202022%20Corruption%20Perceptions%20Index.&text=This%20ranking%20in%20the%20bottom,developmental%20challenge%20to%20the%20nation. Accessed on 8/21/2023.

[6] E. O. Onoja. "The Relationship between the Constitutional Right to Silence and Confessions in Nigeria." *African Journal of Legal Studies* 6 (2013) 189–211, p. 190 https://brill.com/view/journals/ajls/6/2-3/article-

> It is common place for accused persons to be kept in police detention well beyond the statutory 24-hour maximum within which they should be informed of the facts and grounds for their arrest, indeed, charged in court within 48 hours of arrest as guaranteed by the constitution. Although bail is advertised to be the right of an accused person, it is normal practice to deny bail even for petty crimes. This practice is commonly referred to as "police bail." It is also not uncommon for accused persons to be denied the services of a lawyer at this preliminary stage of the process when they require legal advise [sic] the most.[7]

In Nigeria, "[i]t is common practice for police officers to brutalize accused persons at the point of arrest and while in police custody. The goal of this practice is to extract confessions of guilt by any means including the severest forms of torture as well as inhuman and degrading treatment."[8] This violence has been described as "institutional and routine."[9]

The focus of a bond hearing is evidentiary reliability and accuracy. *United States v. Cobix-Espinoza,* 2023 WL 1860982, at *8 (E.D. Ky. Feb. 9, 2023) (citing *United States v. Webb*, 149 F.3d 1185 (Table), No. 98-1291, 1998 WL 381686, at *1 (6th Cir. June 22, 1998)). In any case with evidence, reports, or statements, originating in Nigeria, this Court should be concerned about the reliability and accuracy of the evidence, given the pervasive corruption in the country and routinely brutal interrogation tactics used by law enforcement. The facts of Mr. Ogoshi's treatment in this case are cause for heightened

---

p189_3.xml?language=en#:~:text=The%20current%20right%20to%20silence,the%20common%20law%20of%20England.&text=Under%20the%20common%20law%2C%20any,in%20authority%20vitiates%20a%20confession. Accessed 8/22/2023

[7] Daniel Ehighalua, "Nigerian Issues in Wrongful Convictions," *80 U. Cin. L. Rev.* p. 1136-37 (2013) https://scholarship.law.uc.edu/uclr/vol80/iss4/4 Accessed 8/21/2023
[8] *Id.* at 1137
[9] Open Society Justice Initiative. "Criminal Force Torture, Abuse, and Extrajudicial Killings by the Nigeria Police Force." 2010. P. 65. https://www.justiceinitiative.org/uploads/8063279c-2fe8-48d4-8a17-54be8ee90c9d/criminal-force-20100519.pdf Accessed 8/21/2023

scrutiny and concern about the reliability and accuracy of the evidence.  Mr. Ogoshi was held without access to an attorney for over four months.  He did not have an attorney when he was interviewed by EFCC agents in violation of his constitutional rights.  He was held without bail and not brought before a judge.  He was jailed in Nigeria for three weeks without an attorney, prior to his interview with the FBI.  He did not see a judge until nearly one month after his arrest.

The Court has discretion to require testimony at a bond hearing.  *Stone*, 608 F.3d 939, 948–49.  The Court can more effectively evaluate the reliability and accuracy of evidence with a live witness than with proffered information.  If the government proceeds without putting a live witness on the stand, it avoids both cross examination of its witnesses and providing disclosures under Federal Rule of Criminal Procedure 26.2, which both serve the purpose of testing evidentiary reliability and accuracy.  The Court should require testimony for the government to meets its burden.

**II.     The pretrial services report.**

U.S. Probation filed a pretrial services report in this case.  The report is three pages and was prepared without contacting Mr. Ogoshi's family to verify the provided information or seek supplemental information that might inform the Court's decision. (ECF No. 33, PageID.283-285).

Verification of information provided by defendants is an integral part of pretrial services program operations.[10]  Indeed, many pretrial services practitioners believe that

---

[10] United States Department of Justice.  "Pretrial Services Programs: Responsibilities and Potential."  March 2001. P. 30 https://www.ojp.gov/pdffiles1/nij/181939.pdf (accessed August 21, 2023).

verifying defendant information is the most important function their programs perform. *Id.*

Mr. Ogoshi's mother and brother are willing to speak directly to the pretrial services officer in this case.

### III.  Samuel Ogoshi should be released on bond with conditions.

This Court should release Mr. Ogoshi with conditions. He is requesting release to a halfway house and the required conditions under the Adam Walsh Child Protection and Safety Act.

The Supreme Court held in *Salerno*, "In our society liberty is the norm, and detention prior to trial . . . is the carefully limited exception." 481 U.S. at 755. This presumption of release is encapsulated in the BRA, 18 U.S.C. § 3142. The statute states that the Court "shall order" pretrial release, § 3142(b), except in certain narrow circumstances. Even if the Court determines under § 3142(c) that an unsecured bond is not sufficient, the Court "shall order" release subject to "the least restrictive further condition[s]" that will "*reasonably assure*" the defendant's appearance in court and the safety of the community. § 3142(c)(1) (emphasis added). Under this statutory scheme, "it is only a 'limited group of offenders' who should be detained pending trial." *United States v. Shakur*, 817 F.2d 189, 195 (2d Cir. 1987) (quoting S. Rep. No. 98-225, at 7 (1983), *as reprinted in* 1984 U.S.C.C.A.N. 3182, 3189); *see also United States v. Byrd*, 969 F.2d 106, 109 (5th Cir. 1992) ("There can be no doubt that this Act clearly favors nondetention.").

### IV.  Case law emphasizes two checks that both the BRA and the Constitution impose on the presumption of detention.

Case law has established two checks that the BRA and the Constitution impose on

the presumption: (1) there is an easy-to-meet standard for rebutting the presumption and the prosecution bears the burden of persuasion, and (2) the presumption alone does not warrant detention and must always be weighed along with other factors in § 3142(g). In addition, it is impermissible to detain a defendant in a presumption case based solely on evidence of past dangerousness, the nature of the crime charged, or the weight of the evidence.

### A. Step 1: The Presumption is Easily Rebutted.

Under the law, very little is required for a defendant to rebut the presumption of detention and therefore judges should find the presumption rebutted in most cases. To rebut the presumption, a defendant simply needs to produce some evidence that he will not flee or endanger the community if released. *United States v. Stone,* 608 F.3d 939, 945 (6th Cir. 2010); *Dominguez*, 783 F.2d at 707; *see also United States v. Jessup*, 757 F.2d 378, 384 (1st Cir. 1985), *abrogated on other grounds by United States v. O'Brien*, 895 F.2d 810 (1st Cir. 1990) ("[T]o rebut the presumption, the defendant must produce some evidence."); *United States v. Gamble*, No. 20-3009, 2020 U.S. App. LEXIS 11558 at *1-2 (D.C. Cir. Apr. 10, 2020) (holding that "[t]he district court erred in concluding that appellant failed to meet his burden of production to rebut the statutory presumption" regarding dangerousness because "appellant did 'offer some credible evidence contrary to the statutory presumption,'" including information that he had a job offer) (unpublished) (quoting *United States v. Alatishe*, 768 F.2d 364, 371 (D.C. Cir. 1985)).

The defendant's burden is "relatively light." *Stone,* 608 F.3d at 947. This burden of production is not a heavy one to meet. *Id*; *see also United States v. Wilks*, 15 F.4th 842,

8

846-47 (7th Cir. 2021) (explaining that the defense bears "a light burden of production" to rebut the presumption, "but the burden of persuasion always rests with the government"). Indeed, the presumption of detention is rebutted by "*any evidence* favorable to a defendant that comes within a category listed in § 3142(g) . . . including evidence of their marital, family and employment status, ties to and role in the community . . . and other types of evidence encompassed in § 3142(g)(3)." *Dominguez*, 783 F.2d at 707 (emphasis added); *Jessup*, 757 F.2d at 384.

In *United States v. Hoilman,* 2023 WL 4074630 (6th Cir. 2023), where the defendant was charged with a child pornography offense, the Sixth Circuit held that "the offer by Hoilman's wife to serve as custodian, disconnect internet service to their home, and prevent Hoilman from accessing any internet-capable devices is enough to overcome the presumption of detention." In *United States v. Bothra,* 2019 WL 8883547 (6th Cir. 2019), a drug case, the defendant overcame the presumption of detention that he was not a flight risk by presenting evidence that he, his wife, and his child lived in Detroit for decades.

Mr. Ogoshi is able to meet the "relatively light" burden of rebutting the presumption. He has no prior arrests or convictions. He is in his second year of college. He has ties to his local community and a history of being involved in his local church. Additionally, Mr. Ogoshi cannot flee. He does not have any money. He does not have any contacts or family in the United States, with the exception of his brother. He does not have any identification documents or a passport to flee the country. He has never been to the United States prior to his extradition. Mr. Ogoshi's family does not have significant resources. On these facts the presumption is easily rebutted.

B.   **Step 2: The Presumption Alone is Not Sufficient to Warrant Detention and Must Be Weighed Along with the § 3142(g) Factors.**

After the presumption is rebutted, the Court must weigh the presumption against all of the other evidence about the defendant's history and characteristics that tilts the scale in favor of release. *Stone,* 608 F.3d at 945; *see United States v. Hoilman,* 2023 WL 4074630 (6th Cir. 2023), *Dominguez*, 783 F.2d at 707 ("[T]he rebutted presumption is not erased. Instead it remains in the case as an evidentiary finding militating against release, to be weighed along with other evidence relevant to factors listed in § 3142(g)."); *Jessup*, 757 F.2d at 384 (holding that the judge should consider the rebutted presumption along with the § 3142(g) factors). The Court should not give the presumption undue weight if evidence relating to other § 3142(g) factors supports release.

C.   **Forbidden Considerations in a Presumption Case.**

A judge may not detain a defendant in a presumption case based solely on (1) an unrebutted presumption alone, (2) evidence of the defendant's past dangerousness, or (3) the nature and seriousness of the crime charged, or (4) the weight of the evidence of the person's guilt.

First, the defendant never bears the burden of persuasion-even if the presumption is unrebutted. "Regardless of whether the presumption applies, the government's ultimate burden is to prove that no conditions of release can assure that the defendant will appear and to assure the safety of the community." *Stone,* 608 F.3d at 946. That burden of persuasion lies with the government, the standard of which is always clear and convincing evidence. *Wilks*, 15 F.4th at 846-47 ("[T]he burden of persuasion always rests with the

10

government and an unrebutted presumption is not, by itself, an adequate reason to order detention.").

Second, even if the presumption is not rebutted, a judge is prohibited from detaining a defendant "based on evidence that he has been a danger in the past[.]" *Dominguez*, 783 F.2d at 707. Instead, past dangerous conduct is relevant only to the extent that the government can prove-by clear and convincing evidence-that the defendant is "likely to continue to engage in criminal conduct undeterred [ ] by . . . release conditions." *ld.* Even when a defendant is charged with a serious crime or has a significant criminal history, there may be release conditions that will reasonably assure the safety of the community.

Third, to rebut the presumption of dangerousness, a defendant need not "demonstrate that narcotics trafficking [or another serious crime] is not dangerous to the community." *ld.* at 706.  Instead, this Court must analyze the defendant's individual characteristics under § 3142(g).

Fourth, the Court is forbidden from relying solely on the weight of the evidence of guilt to detain a defendant in a presumption case. A defendant is not required to "'rebut' the government's showing of probable cause to believe that he is guilty of the crimes charged." *ld.* This makes sense - a person's likelihood of guilt is analytically distinct from whether there are conditions of release that will reasonably assure the person's appearance or the safety of the community.

> **D. The BRA does not permit pretrial detention, or the holding of a detention hearing based solely on a defendant's immigration status or the existence of an ICE detainer.**

Defendants subject to immigration detainers are treated no differently than other

11

defendants under the express terms of the BRA. The BRA demands an individualized analysis of the § 3142(g) factors to determine whether a defendant should be released on bond prior to trial. *See United States v. Santos-Flores*, 794 F. 3d 1088, 1092 (9th Cir. 2015) ("The court may not [ ] substitute a categorical denial of bail for the individualized evaluation required by the Bail Reform Act"). Because § 3142(g) demands such an individualized analysis, this Court cannot categorically deny bond to removable aliens solely on the basis of their immigration status or the existence of an immigration detainer. *See United States v. Sanchez-Rivas*, 752 F. App'x 601, 604 (10th Cir. 2018) (holding that defendant "cannot be detained solely because he is a removable alien"); *Santos-Flores*, 794 F.3d 1088, 1092 (9th Cir. 2015) ("We conclude that the district court erred in relying on the existence of an ICE detainer and the probability of Santos–Flores's immigration detention and removal from the United States to find that no condition or combination of conditions will reasonably assure Santos-Flores's appearance pursuant to 18 U.S.C. § 3142(e)."); *United States v. Barrera-Omana*, 638 F.Sup.2d 1108, 1111 (D. Minn. 2009) (concluding that the mere presence of an ICE detainer does not override Congress' detention plan in § 3142(g)); *United States v. Chavez-Rivas*, 536 F. Supp. 2d 962, 968 (E.D. Wis. 2008) ("[I]t would be improper to consider only defendant's immigration status, to the exclusion of the § 3142(g) factors, as the government suggests."). This Court has previously released defendants on bond with an ICE detainer despite significantly more evidence of prior criminality and failures to appear. (*United States v. Camel-Chimel,* 1:22-cr-149, ECF No. 13, PageID.30-33).

Section 3142(d)(1)(B) provides for the temporary detention of removable aliens "for

12

a period of not more than ten days" if the court finds that the individual may flee or poses a danger to any other person or the community. 18 U.S.C. § 3142(d). If the court fails to make such a finding, the court must treat the individual in accordance with the other provisions of the BRA. 18 U.S.C. § 3142(d)(2). Likewise, if DHS "fails or declines to take such person into custody during that [ten-day temporary detention] period, such person shall be treated in accordance with the other provisions of [the Bail Reform Act]." § 3142(d)(2). The other provisions of the BRA require release unless the government meets its heavy burden of showing the person presents an unmitigable risk of flight. Accordingly, § 3142(d) explicitly makes removable aliens subject to the BRA's general standard for pretrial release and therefore implicitly authorizes their release on bond.

"Other than during this temporary detention period, individuals on release arising from other offenses and non-citizens are treated the same as other pretrial criminal defendants under the BRA." *United States v. Soriano Nunez,* 928 F.3d 240, 244-245 (3rd Cir. 2019). "There is no conflict between the detention-and-release provisions of the two statutes." *United States v. Lett*, 944 F.3d 467, 471 (2nd Cir. 2019). "The district court must apply the BRA as it would to any other criminal defendant, notwithstanding the existence of any parallel proceedings." *Id. at 472*.

In asking the Court to consider the presence of an ICE detainer, the government may suggest that the risk of Mr. Ogoshi's removal by ICE if released on bond presents a cognizable risk of non-appearance under the BRA. But the risk that the government will remove Mr. Ogoshi from the United States while this case is pending does not qualify as a risk of flight under the BRA. The BRA contemplates the risk that the defendant will

13

flee—i.e., make a voluntary decision not to appear as directed. Being forcibly removed from the country by ICE is not voluntary flight. The government is not forclosed from issuing immigration bail to alleviate the risk of non-appearance, as occurred in *United States v. Camel-Chimel,* 1:22-cr-149.

Moreover, the Executive Branch's Department of Justice should not be able to threaten that, if this Court follows the law under the Bail Reform Act, another arm of the Executive Branch (ICE/DHS) will cause the defendant not to be available for trial. If this Court orders release under the BRA and the Executive Branch chooses to prioritize Mr. Ogoshi's removal over this prosecution, it is free to do so by dismissing this case and processing Mr. Ogoshi for removal. But the Executive cannot hold the courts and Mr. Ogoshi hostage over the prospect that it may make such a choice. *See United States v. Trujillo-Alvarez*, 900 F. Supp. 2d 1167, 1180 (D. Or. 2012) ("[I]f the Executive Branch chooses to forgo criminal prosecution of Mr. Trujillo-Alvarez on the pending charge of illegal reentry and deport him from the United States, as previously stated, there is nothing further for this Court to do.").

### E. The § 3142(g) factors weigh in favor of release.

The § 3142(g) factors weigh in favor of release. Under § 3142(g), the judicial officer shall, in determining whether there are conditions of release that will reasonably assure the appearance of the person as required and the safety of any other person and the community, take into account the available information concerning--

> **(1) the nature and circumstances of the offense charged, including whether the offense is a crime of violence, a violation of section 1591, a Federal crime of**

**terrorism, or involves a minor victim or a controlled substance, firearm, explosive, or destructive device;**

The nature of the charged offenses is serious and in a category of offenses listed in § 3142(g)(1). However, there are no allegations of terrorism, weapons possession, controlled substance possession, or physical violence by Mr. Ogoshi. It is an offense that was alleged to be committed for financial gain. The alleged offense was complicated and required certain means to carry it out and obtain the proceeds, such as hacked social media accounts, bank accounts, cryptocurrency accounts, and consistent use of the internet.

Mr. Ogoshi is seeking release on strict bond conditions, which would include monitoring at the halfway house and electronic monitoring by U.S. Probation. The Court could tailor additional conditions to restrict access to the means of committing this type of offense or engaging in any other criminal activity.

**(2) the weight of the evidence against the person;**

The weight of the evidence goes to dangerousness, not the weight of the evidence of the defendant's guilt. *Stone,* 608 F.3d at 948. Dangerousness is determined not by the offense, but by whether a defendant is "likely to continue to engage in criminal conduct undeterred [ ] by . . . release conditions." *Dominguez*, 783 F.2d at 707. Mr. Ogoshi is unlikely to engage in criminal conduct while on bond. Mr. Ogoshi has no prior criminal history. He does not have a history of illicit drug use.

The alleged offense conduct does not suggest that he will engage in criminal conduct while on bond. The allegations suggest that he was part of a larger conspiracy and relied on others for the means to commit the offense and obtain proceeds.

In December 2022, the FBI communicated to the Nigerian government that there were six members of the conspiracy. The FBI requested that the EFCC arrest all six individuals at the same time, but only three have been indicted. Two of the unindicted persons provided the means to commit the offense. F.E. "provided financial support to all the extortionists." F.E. recruited individuals in the United States who received payments from victims and then transferred the funds via cryptocurrency. E.W. hacked social media accounts and then sold them to individuals. The third unindicted person, O.E. had accounts that contained "the most amount of sextortion victim images." According to the FBI's communications to the Nigerian government, Mr. Ogoshi and his co-defendants relied on others for the means (ie., the social media accounts, financial support, transfer of funds) to commit the offense. The allegations do not suggest that Mr. Ogoshi could have committed this offense on his own or that he will attempt to commit it while on bond.

Mr. Ogoshi is requesting strict bond conditions. He is requesting release to a halfway house, where his activities can be monitored, and he can be prohibited from accessing electronic devices. He will not be eligible to work.

> **(3) the history and characteristics of the person, including--**
> **(A) the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and**
> **(B) whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State, or local law; and**

Mr. Ogoshi is a 22-year-old college student with no prior criminal history. He is in good mental and physical health. He has a work history, selling traditional African

clothing, between secondary school and college. He has been a student for most of his life. He was in his second year of college at the time of his arrest.

Mr. Ogoshi does not have financial resources or travel documents to flee. He does not have family members in this country, however, he is seeking release to a halfway house. He would be required to have electronic monitoring as a bond condition. These conditions will allow his activities to be closely monitored and allow his whereabouts to be known.

He does not have a history of drug or alcohol abuse. He has never used drugs. His last use of alcohol was years ago.

Because he has never been arrested or convicted of an offense, he has no history of being on court supervision. His personal history suggests that he would be compliant will all terms of bond.

**(4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release. . .**

Mr. Ogoshi would pose no danger to the community upon his release. He is seeking strict terms of release. He does not have assets. He has no history of physical violence, weapons possession, or drug possession or distribution. His personal history suggests that he would be compliant with terms of bond and would not commit crimes. The bond conditions and his lack of assets to flee suggest that he would appear for all court hearings.

### Conclusion

Mr. Ogoshi respectfully requests that this Court release him on bond with conditions that he live in a halfway house and all additional conditions required by the Adam Walsh

Child Protection and Safety Act and 18 U.S.C. § 3142(c)(1)(B), including electronic monitoring.

                                        Respectfully submitted,

                                        SHARON A. TUREK
                                        Federal Public Defender

                                        <u>/s/ Sean R. Tilton</u>
                                        SEAN R. TILTON
                                        Assistant Federal Public Defender
                                        50 Louis, N.W., Suite 300
                                        Grand Rapids, MI 49503
Dated: August 23, 2023                616-742-7420