1                    IN THE UNITED STATES DISTRICT COURT

2                  FOR THE WESTERN DISTRICT OF MICHIGAN

3                            SOUTHERN DIVISION

4        UNITED STATES OF AMERICA,

5                    Plaintiff,          No: 2:22cr25

6         vs.

7        SAMUEL OGOSHI,
         SAMSON OGOSHI,
8
                     Defendants.
9


10       Before:

11
                             THE HONORABLE RAY KENT
12                           U.S. Magistrate Judge
                             Grand Rapids, Michigan
13                        Friday, September 1, 2023
                          Detention Hearing Proceedings
14
         APPEARANCES:
15
                    MR. MARK A. TOTTEN, U.S. ATTORNEY
16                  By:  MR. DANIEL Y. MEKARU
                    MR. DAVIN REUST
17                  330 Ionia Avenue, NW
                    P.O. Box 208
18                  Grand Rapids, MI 49501-0208
                    (616) 456-2404
19
                            On behalf of the Plaintiff;
20
                    FEDERAL PUBLIC DEFENDER
21                  By:  MR. SEAN TILTON
                    50 Louis Street, NW, Suite 300
22                  Grand Rapids, MI 49503-2633
                    (616) 742-7420
23
                            On behalf of Samuel Ogoshi.
24

25

```
 1                  Willey & Chamberlain LLP
                    MS. JULIA ANNE KELLY
 2                  300 Ottawa Avenue, NW, Suite 810
                    Grand Rapids, MI 49503
 3                  (616) 458-2212

 4                       On behalf of Samson Ogoshi.

 5      TRANSCRIBED BY:  MR. PAUL G. BRANDELL, CSR-4552, RPR, CRR

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1    09/01/2023

2    10:56 a.m.

3    THE CLERK:  The United States District Court for the

4    Western District of Michigan is now in session.  The Honorable

5    Ray Kent, United States Magistrate Judge, presiding.

6    THE COURT:  This is 22cr25, United States versus

7    Samuel and Samson Ogoshi.  Mr. Reust, Mr. Mekaru on behalf of

8    the United States.  Mr. Tilton on behalf of Samuel.  Ms. Kelly

9    on behalf of Samson.  We're here for a bond hearing that has

10   been scheduled for each of the Defendants.  I have received the

11   United States' detention memo.  Appears in the Court's record

12   ECF 41 and the lengthy exhibits attached thereto.  I have read

13   and/or reviewed those, including the handwritten statements

14   provided to me here this morning right before we were to begin.

15   I have also read Defendant's motion for bond in Samson's case

16   that would be ECF 36, and in Samuel's case it would be ECF 35.

17       In addition, I have read the pretrial services reports

18   in Samson's case.  That would be ECF 32, and Samuel, ECF 33.

19       Following the investigation, and granted, the

20   investigation was short, given the geography of the situation,

21   pretrial services is recommending that I order both Samuel and

22   Samson to be detained.

23       Gentlemen, we are going to have a bond hearing here in

24   a moment.  There are two issues at play in a bond hearing.  One

25   is risk of nonappearance.  The other is danger to the

1    community.  The government has the burden of proof on both of

2    those issues.  On the issue of risk of nonappearance, the

3    government's burden is something we call a preponderance of the

4    evidence.  That means there is just slightly more evidence

5    suggesting somebody is a risk of nonappearance than evidence to

6    the contrary.

7         On the other issues, danger to the community, the

8    government's burden is a heavier one, something we call clear

9    and convincing evidence, and requires more evidence by the

10   government.

11        A couple things about a bond hearing.  The rules of

12   evidence that apply in a trial do not apply in a bond hearing.

13   So things like hearsay evidence, which would not be admissible

14   if we were having a trial, are admissible in a bond hearing.

15   In fact, even if the government collected evidence against you

16   illegally, and at this point I have no reason to believe that

17   it did, that evidence would probably come in for our purposes

18   here today.

19        Moreover, neither the government nor you have to

20   produce evidence by putting witnesses on the witness stand.

21   You can do it instead using a procedure we call a proffer.

22   What that means is the lawyers tell me facts which I then

23   consider as if they had come from a witness on the witness

24   stand.

25        Are there -- before we get rolling here, are there

1    preliminary matters that we should take up, Mr. Reust?

2         MR. REUST:  Not from the government's perspective,

3    Your Honor.  Everything the Court just said is the way that the

4    government would intend to proceed.

5         THE COURT:  Mr. Tilton?

6         MR. TILTON:  Your Honor, I did make an argument in

7    Samuel Ogoshi's pretrial or bond motion requesting that the

8    Court direct the government to produce evidence at least

9    originated in Nigeria, by witness testimony.  Under the Stone

10   case the Court has the discretion to allow the parties to

11   proceed by proffer or require testimony.  Essentially the basis

12   of our -- our argument to require testimony here is because of

13   Nigeria's generally considered to be corrupt criminal justice

14   system.  Mr. Ogoshi and his brother were held for a period of

15   time, according to their Nigeria lawyer, that went against

16   Nigeria law.

17        THE COURT:  They were held for months.

18        MR. TILTON:  Correct.  Before that they had an

19   attorney.  The government produced some written statements from

20   both Defendants today.  There were four statements that were

21   produced -- that were attributed to Samuel Ogoshi, three prior

22   to the FBI's interview in Nigeria.

23         So I think that there are concerns here about the

24   circumstances under which those statements were taken, and the

25   Court does have an obligation to look at both the reliability

1    and the accuracy of the evidence that the government produces,

2    and the Defendant, whether by proffer or by witness testimony,

3    and so I think that the Court has authority and discretion to

4    consider that the evidence from Nigeria, just based upon its --

5    its originating from Nigeria, and the circumstances of a number

6    of written statements without counsel, that the Court should be

7    concerned and require more information than simply a proffer

8    from the government.

9             THE COURT:  All right.  Thank you.  Thank you,

10   Mr. Tilton.

11            Ms. Kelly, do you wish to be heard on this issue?

12            MS. KELLY:  Thank you, Your Honor.  Just briefly and

13   specifically in relation to Exhibits 10 and 11 that we received

14   this morning.  I -- I would join in Mr. Tilton's objection to

15   proceeding with those exhibits specifically.  They are

16   handwritten.  In reviewing them it appears that there were two

17   different handwriting, two different authors.  I don't know who

18   those were.  I don't have any of the circumstances, and I am

19   not going to be able to -- to get more clarification on that.

20   So I would object to -- to those being admitted by proffer

21   only.  Thank you.

22            THE COURT:  All right.  Ms. Kelly, I'll tell you, I

23   thought -- maybe I am dead wrong, but I was assuming they were

24   written by your clients, but I don't know.

25            MS. KELLY:  I know my client's name is on it.  I am

1    talking about the -- the first paragraph, if the Court would

2    look at it, compared to the other written statements, it

3    appears that there is two different handwriting going on there.

4    So I don't know who that would be, and I don't know how these

5    were taken.

6           Obviously, this Court has reviewed Samson Ogoshi's

7    statements.  The first one given is a complete denial, and then

8    there is another one written out that same day.  So I would

9    take issue with those being admitted by proffer only.

10           THE COURT:  All right.

11           MS. KELLY:  Thank you.

12           THE COURT:  You are welcome.

13           Mr. Reust?

14           MR. REUST:  Thank you, Your Honor.

15           The first thing I'd note, and the primary thing that I

16    highlight in the government's response by this request by the

17    Defense is that the Defendants speak generally about what they

18    claim are conditions in Nigeria, but they nowhere say that they

19    were forced or coerced to make these statements, and in fact,

20    you know, turning to Exhibits 10 and 11, which admittedly we

21    did just receive this morning as well, which is why we hadn't

22    had the opportunity to give them to Defense counsel or the

23    Court before then, but those statements began with a statement

24    that they are made voluntarily.

25           Additionally, the law is quite clear that statements

1    made in a foreign country to foreign officials, first, don't

2    have to be Mirandized, and two, can be considered even as

3    substantive evidence at trial in the case, and I can cite

4    several circuit cases to the Court that would indicate that as

5    well.

6            The other thing that I would point out to the Court is

7    that the statements they make are corroborated by a significant

8    amount of additional evidence.  It's not like we are

9    considering those statements that they made in a vacuum.  There

10   was evidence obtained from their phones when they were in

11   Nigeria.  There is significant evidence from the United States

12   and legal process in the United States that corroborates the

13   statements that they made.  And the fact is just that those

14   witnesses that would be for the government from Nigeria aren't

15   here.  The entire reason why the rules of evidence don't apply

16   at this proceeding are because we -- this is just not the time

17   to litigate this issue of whether these statements are

18   admissible.  The briefing schedule on something like that,

19   which is a dispositive motion, would be months, and will likely

20   be months if the Defendants wish to suppress those statements

21   later on.  And they don't want to take that time.  They asked

22   for the hearing to be today.  So I would ask that the Court

23   do -- does at least consider these statements, give them

24   whatever weight it believes is necessary or appropriate, and

25   just consider them in the context of the other evidence the

1    United States intends to proffer.

2         THE COURT:  All right.  Thank you, Mr. Reust.

3         Mr. Tilton?

4         MR. TILTON:  May I offer one quick rebuttal, Your

5    Honor?

6         THE COURT:  Yes.

7         MR. TILTON:  Your Honor, the -- the Court and the

8    government can proceed using hearsay evidence.  I -- I would

9    note that as we -- with concerns with these statements and the

10   conditions that they were taken under, particularly -- well, I

11   would say all statements in Nigeria, whether they were to the

12   FBI or to Nigerian authorities, the FBI sent communications to

13   the Nigerian government to arrest Mr. Ogoshi, both Ogoshis and

14   four other individuals, and at the time of that communication

15   they said that six individuals -- excuse me, that a team of two

16   case agents, investigative analysis, a member of the FBI's

17   computer analysis response team, a supervisory special agent

18   and the Assistant United States Attorney prosecuting the case

19   will all be traveling to Nigeria in January of this year.  So I

20   don't think that we are asking that it has to be a Nigerian who

21   was present for all of these statements, but perhaps an FBI

22   agent who traveled on that team to Nigeria and could testify

23   about the conditions the Ogoshis were held in and when they

24   arrived on the date of July -- January 22nd, as to the state

25   that they did.  They would have been in Nigeria for both Samson

1    Ogoshi's arrest and a number of statements made by Samuel

2    Ogoshi.  Thank you.

3           THE COURT:  You are welcome.  I guess it occurs to me

4    that if -- you know, and I have no reason to dispute

5    Mr. Tilton's representations about the Nigerian legal system

6    and the state of affairs in Nigeria, but if a suspect can be

7    coerced into admitting to wrongdoing, he could certainly be

8    coerced into saying that he is giving the statement

9    voluntarily.  So I don't find much weight in the fact that in

10   the statement, at least I recall Samuel -- Samuel was

11   voluntary, and that he had been treated well and had been fed

12   and was not being abused.  I mean, all of those things could be

13   coerced, and nobody in this room knows -- well, I don't know if

14   nobody.  I don't know what pressures may have been brought to

15   bear on either of these Defendants prior to their interviews by

16   the FBI agents or during those -- not accusing the FBI of

17   anything, but in conjunction with those interviews or after

18   those interviews.

19          Having said that, though, I agree with Mr. Reust that

20   the Defendants' remedy here, if, in fact, there is evidence

21   that the statements were coerced or that there were

22   irregularities under United States law in a way that Samuel and

23   Samson were treated, the remedy is to bring a motion to

24   suppress, or a remedy -- I am not suggesting it's the only

25   remedy, but a remedy would be a motion to suppress the

1    statements for consideration by the District Judge in this

2    case.

3            For purposes of today's hearing, though, I am going to

4    allow the government and the Defendants to proceed by proffer.

5    Anything else we should take up before we get started,

6    Mr. Reust?

7            MR. REUST:  Not from the government's perspective.

8            THE COURT:  Mr. Tilton?

9            MR. TILTON:  No, Your Honor.  Thank you.

10           THE COURT:  Ms. Kelly?

11           MS. KELLY:  No, Your Honor.  Thank you.

12           THE COURT:  All right.  Mr. Reust, the burden of proof

13   is on you.  The floor is yours.

14           MR. REUST:  Thank you, Your Honor.

15           I would just begin by moving to admit Government's

16   Exhibits 1 through 11?  I think they are largely in the record

17   and my understanding is that the Defense has no objection to

18   the Court considering them.

19           THE COURT:  Objections to the admissions of the

20   exhibits, Mr. Tilton?

21           MR. TILTON:  No, Your Honor.  Thank you.

22           THE COURT:  Ms. Kelly?

23           MS. KELLY:  No, Your Honor.

24           THE COURT:  They are admitted.

25           MR. REUST:  Thank you, Your Honor.

1    So by way of proffer, on March 25th of 2022, police

2    responded to the home of a 17 year old high school boy who had

3    died from a self-inflicted gunshot wound.  That boy is

4    identified as victim 1 in the indictment.

5    Later that same day, March 25th of 2022, victim 1's

6    girlfriend received a collage of images on her Instagram

7    account from a user with the user name dani.robertts.  The

8    collage included nude and clothed images of victim 1.  The

9    dani.robertts account told victim 1's girlfriend, quote,

10    cooperate with me, end quote.  Victim 1's girlfriend continued

11    to speak with this dani.robertts account for a short period of

12    time.  Informed the dani.robertts account that victim 1 had

13    taken his own life, and eventually stopped responding to the

14    account and reported the information to the police.

15    Using that information police obtained a search

16    warrant for the Instagram account dani.robertts.  Exhibit 1 is

17    a copy of the profile photo used for the dani.robertts account.

18    Exhibit 2 is a copy of a conversation between the dani.robertts

19    account and victim 1 on March 24th and 25th of 2022.

20    The first several pages are introductory conversation

21    and include the dani.robertts account trying to make victim 1

22    comfortable.  In page ID 54 in the record, victim 1 tells

23    dani.robertts that he is 17 years old.  On page ID 57,

24    dani.robertts tells victim 1 that she likes, quote, hanging out

25    with friends and playing sexy games, end quote.  The

1   dani.robertts account then aggressively tries to get victim 1
2   to engage in what it calls, quote, sexy picks, over about the
3   next 15 pages of Exhibit 1.
4       At page ID 73, dani.robertts got the pictures she
5   wanted and immediately sends this message.  Quote, I have
6   screenshot all your followers and tags can send this nudes to
7   everyone and also send your nudes to your family and friends
8   until it goes viral.  All you have to do is cooperate with me
9   and I won't expose you.
10      The dani.robertts account follows that up with, I got
11  all I need RN, which means right now, and then goes onto say,
12  to make your life miserable dude, end quote.
13      Over about the next 40 minutes the dani.robertts
14  account hounds victim 1 relentlessly.  On page 1102 of that
15  exhibit, Exhibit 1, it threatens to release the images
16  following a countdown.  Pages 1103 and 1104 it says, quote,
17  just try to act smart with me and I am going to make sure all
18  your family members see this.
19      Page 1107, watch how I make your life miserable, end
20  quote.
21      Page ID 128, victim 1 pays $300, which was the agreed
22  upon amount with the dani.robertts account.  On page ID 144,
23  victim 1 is begging for dani.robertts to delete the photo
24  collage after paying the $300, but dani.robertts asks for more
25  money, now $800.  Victim 1 responds that he doesn't have it.

On page ID 147, dani.robertts begins another countdown from 10 down to 1.

On page ID 150, victim 1 has shown dani.robertts a photo of his bank account with $55 in it, and offers to pay everything he has.  The dani.robertts account responds, quote, no deal, end quote.

On page ID 155, victim 1 pleads with the account. Dani.robertts responds, lol, I love this, end quote.

On page ID 158, the dani.robertts account says, quote, I am going to start trending soon, end quote.

On page ID 162, victim 1 asks, why are you doing this to me?  The dani.robertts account responds because, it's going to be your worse night marrow, presumably nightmare, end quote.

On page ID 172, victim 1 says, I am begging for my own life, end quote.  On page ID 188, the dani.robertts account starts yet another countdown from 10.

On page ID 193, the dani.robertts account says, quote, I bet your GF will leave you for some other dude, end quote. On page ID 195, the dani.robertts account says, quote, just waiting for your GF to get the text, end quote, and then goes onto say, quote, you know what will happen.  Victim 1 responds, I will be dead.  Like I want to KMS, end quote.  The dani.robertts account responds, sure.  I want you to be dead, end quote.

On page ID 198, victim 1 says he can't pay anymore

money, and dani.robertts, the account says, quote, okay, then I will watch you die a miserable death, end quote.

On page ID 201, victim 1 says, quote, it's over.  You win bro, end quote.  The dani.robertts account responds, quote, okay.  Good-bye.  Enjoy your miserable life, end quote.  Victim 1 responds, I am KMS RN.  BC of you, end quote, meaning, I am killing myself right now because of you.  The dani.robertts account responds, good.  Do that fast.

Page ID 202, the dani.robertts account says, or I'll make you do it, I swear to God, end quote.

FBI analyzed that account, the dani.robertts account, and saw that in a message to someone else the dani.robertts account instructed that person to contact them at their personal account which was a gmail account hofinghammark@gmail.com, FBI obtained the search warrant for that account and it had an e-mail to frostsamuel14@gmail.com with a photo of Samuel Ogoshi, Samson Ogoshi and two other people.

FBI then obtained a search warrant for the frostsamuel14@gmail.com account, and analyzing that account the FBI determined that it appeared to be Samuel Ogoshi's primary e-mail account.  In it, the gmail return, there was a note that appeared to be the same or similar to the extortion demand used in the texts to victim 1.  That note reads, quote, hey I have screenshot all ur followers and tags and those that comment on

1    ur post.  I can send this nudes to everyone and also send your

2    nudes Until it goes viral....All you've to do is to cooperate

3    with me and I will not expose you, end quote.

4         The account also -- the same gmail account also

5    contained numerous images of other sextortion victims contacted

6    by the dani.robertts Instagram account, and one of those was

7    the collage sent by -- sent to victim 1.  The account also

8    included Google search history and agents found evidence of the

9    searches following victim 1's death.  Exhibit 3 is some of

10   those searches that were shown to Samuel Ogoshi during his

11   interview with the FBI in Nigeria.

12        Page ID 204, there is a search for Michigan suicide.

13   Page ID 205, there is a search for Instagram blackmail death.

14   Page ID 206, there is a search for how can FBI track my IP from

15   another country.

16        There are additional searches in the Google history

17   that were not shown in the Exhibit 3, that include how to hide

18   my IP address without VPN?  How your IP address can be traced?

19   How can FBI track my IP from another country, and how to clear

20   your IP address on Instagram?  These were all made on April

21   1st, 2022.

22        FBI agents identified a list of additional telephone

23   numbers and e-mail addresses that were associated with a

24   dani.robertts Instagram account.  Agents subpoenaed Google and

25   Apple requesting any accounts linked to the e-mails and

1    telephone numbers.  One of the phone numbers was used to

2    register an Apple account, specifically a FaceTime account with

3    the Apple ID of ogoshisamsonzero@gmail.com.  In the FBI's

4    analysis, this appeared to be Samson Ogoshi's primary e-mail

5    account, and this appeared to be his primary Apple ID account

6    as well.  Twelve images -- and it contained 12 images of

7    dani.robertts including the Instagram profile image used for

8    dani.robertts were found in that iCloud account.

9         Further, there was a screen capture of calls made in

10   Instagram in Samson Ogoshi's iCloud account that shows calls

11   made from the dani.robertts account to who has been identified

12   in the indictment as victim 2.  Agents went back to the

13   dani.robertts Instagram return and analyzed the statements to

14   victim 2, and those are Government's Exhibit 4.  The first few

15   pages show introduction in trying to make victim 2 feel

16   comfortable.

17        Page ID 211, the dani.robertts account says, sometimes

18   I play erotic near pic exchange lol, end quote.  Eventually the

19   dani.robertts account received a nude photo from victim 2.  On

20   page ID 223 to 224, the account then responds, quote, I have

21   screenshot all ur followers and tags and send this nudes to

22   everyone and also send your nudes to your family and friends

23   until it goes viral.  All you have to do is cooperate with me

24   and I won't expose you, end quote.

25        Page ID 225, quote, cooperate with me and I won't

expose u, and then begins a count down at 10.  Page ID 228,

quote, you are going to regret ever acting smart were me, end

quote.  Quote, just don't pay me, end quote.  And then another

quote, MC I am gonna F you up.  The F word is included in

there, end quote.

Page ID 235, victim 2 indicates he doesn't have the

money.  And that dani.robertts account responds, enjoy your

miserable life dude, end quote.

Paged 238, victim 2 again says he doesn't have the

money, and that dani.robertts account responds quote, haha, I

love this, end quote.

On paged 240 the dani.robertts account responds, your

family are going to regret they ever had you when I am done

with you, end quote, and then quote, you choose money over life

right now, end quote.

Paged 255, the dani.robertts account says, dude don't

play games with me.  I am dangerous, end quote.  And on page

261 it says, quote, I will make you regret your life.  I will

make you commit suicide, end quote.

In analyzing Samson Ogoshi's iCloud account agents

also found additional nude images of victim 2 and nude images

of multiple other boys including at least two other minors.

Those minors were interviewed and acknowledged being sextorted

over Instagram in much the same way victim 1 and victim 2 were.

On January 17th, 2023, Samuel Ogoshi was arrested by

1    the EFCC, and he made statements to Nigerian police.  Those
2    states are -- were handwritten and contained in Government's
3    Exhibit 10.  At the beginning Samuel Ogoshi says, I am not
4    obligated to say anything unless I wish to do so, but whatever
5    I say shall be taken down in writing and may be given in
6    evidence.  I freely would like to state thus follows.  I have
7    been informed of my right to my lawyer before making these
8    statements, but in the absence of my lawyer I wish to continue
9    with the making of my voluntary statement.

10          It goes onto say later on the bottom of that page, I
11    started on-line romance dating scam in the year 2022 January.
12    I do my on-line romance scan by creating an Instagram profile
13    with a foreign girl's name and download good profile pictures
14    of foreign girls on Instagram and use the Instagram profile to
15    follow boys having used my downloaded picture as my profile
16    picture on Instagram.  Then I text them on Instagram and ask
17    them to exchange nudes with me.  I send them downloaded nudes
18    which is not mine, and I ask for their own nudes, which they
19    will send to me.  After collecting their nudes I now proceed to
20    blackmail them.

21          On January 24th, Samson -- of 2023, Samson Ogoshi was
22    arrested by Nigeria -- in Nigeria, I'm sorry, by the EFCC.
23    Exhibit 11 is a copy of Samson's handwritten statement.  It
24    begins, quote, I have -- I, Samson Ogoshi, having been duly
25    cautioned in English language that I am not obligated to say

1   anything unless I wish to do so, but whatever I say shall be

2   taken down in writing and may be given in evidence, I freely

3   and voluntary wish to state as follows.

4        It goes on with the third page of this exhibit to say

5   my brother, Samuel Ogoshi, taught me Internet frauding for some

6   months ago.  Blackmailing is the only type of Internet fraud I

7   do.  I do blackmailing by first getting Instagram account, edit

8   it to name -- to look like a U.S.A. citizen and upload a female

9   picture as the profile.

10       Then it says, first of all -- it's handwritten, so

11  somewhat difficult to read.  Chat and ask them if they want to

12  exchange nudes.  They exchange each other and blackmail them

13  for money.  By nudes I mean naked picture.  I cannot remember

14  the number of people that I blackmail.

15       On February 8th of 2023, FBI agents traveled to

16  Nigeria and interviewed Samuel Ogoshi and Samson Ogoshi and the

17  reports of those interviews are contained in Exhibit 7 as well

18  as the waivers that they were given acknowledging that they

19  understood they have the right to an attorney, didn't have to

20  speak to the agents regardless of what they had done before.

21       During that interview Samuel Ogoshi stated he

22  purchased the Instagram accounts that were used for blackmail.

23  He targeted men and boys pretending to be college-aged girls.

24  He solicited nude photos from victims, put those photos in

25  collages and extorted his victims for money.  He created the

1    account with the name dani.robertts.  He claimed that he and

2    Ezekiel Robert, which is the third Defendant in the indictment,

3    worked together in the extortion of victim 1, but notably as an

4    aside, the FBI analysis of the dani.robertts account, all the

5    associated devices with the investigation, and the other gmail

6    and iCloud accounts associated with the investigation, indicate

7    that Samuel was the one controlling the dani.robertts account

8    at the time of victim 1's death.

9        Samuel Ogoshi also stated that he learned after victim

10   1's death and told Samson Ogoshi about it.  Samuel Ogoshi

11   stated that after learning of victim 1's death he stopped

12   engaging in extortion for a period of time but then he returned

13   to doing it again.

14       When Samuel Ogoshi was originally arrested the EFCC

15   had seized his phone and agents analyzed that phone and at the

16   time of arrest it contained additional sextortion images and

17   collages that appeared to have been created shortly before his

18   arrest and leading up to his arrest.

19       FBI also interviewed Samson Ogoshi that day, and the

20   report of that interview is Exhibit 8.  It contains the same

21   waiver and the advice of rights that were given to Samuel

22   Ogoshi.

23       Samson told police that he had been involved in the

24   fraud for about a year.  He said that Samuel bought Instagram

25   accounts and that he then used.  He described -- described the

scheme as using the image of a female porn star and then
contacting men and boys to get them to send nude images and
then demanding money.  He stated that he made good money from
his blackmail.  He stated he was shown images of nude males
from his account.  He said he didn't recognize them but that if
they were in his account that he was involved in their
blackmail.

He stated that he had learned of victim 1's death from
Samuel and that he had also had stopped engaging in sextortion
for a short while but then resumed.

The EFCC had also seized Samson Ogoshi's phone when he
was arrested, and an analysis of that phone indicated that it
had continued to engage in sextortion because there were
additional collages and images that appeared to have been
created shortly before his arrest.

On August 12th and 13th of 2023, FBI agents
transported Samuel and Samson Ogoshi both from Nigeria to Grand
Rapids, Michigan.  In doing so the Department of Homeland
Security Immigration and Customs Enforcement or ICE, placed
detainers on both Samuel Ogoshi and Samson Ogoshi.  Exhibit 5
is a copy of the detainer for Samuel and Exhibit 6 is a copy of
the detainer for Samson.

Immigration and Customs Enforcement Assistant Field
Officer Director Todd Osborne has provided an affidavit that if
the Defendants were released on bond ICE would detain them and

1    begin deportation proceedings.  That is recorded in Director

2    Osborne's declaration, which is Government's Exhibit 9.

3              I also spoke to U.S. Probation Officer Thomas Mize,

4    who informed me that if the Defendants were given pretrial

5    release to a local facility it would likely be the Alternative

6    Directions facility.  He spoke with the director of that

7    facility who indicated that it allows residents to have access

8    to Internet capable phones in common areas and in their rooms.

9    Officer Mize also confirmed that to his knowledge every

10   facility that's available to the probation office that houses

11   pretrial releasees has those same allowances.

12             That is all the information that I have to proffer at

13   this time, Your Honor.  Thank you.

14             THE COURT:  Okay.  Mr. Tilton, Ms. Kelly?

15             MR. TILTON:  Thank you, Your Honor.

16             Your Honor, I am going to start by proffering

17   background information about Samuel Ogoshi.  The information is

18   contained in both the pretrial services report and in the --

19   Mr. Samuel Ogoshi's motion and brief for pretrial release.

20             The information was provided either by Mr. Ogoshi

21   directly to the pretrial services officer or it was provided

22   directly to me and my investigator by Samuel Ogoshi's brother,

23   mother and attorney, and that is Samuel Ogoshi is a 22 year old

24   college student in his second year at Nasarawa State University

25   in Nigeria studying sociology.

He is a native of Nigeria.  Has never left the country until his extradition in this case.  He does not have a passport.  He does not have any prior arrests or convictions, which is also corroborated by the government's initial pretrial statement which lists no criminal history for Mr. Ogoshi.

He doesn't -- he has never been to jail prior to this arrest, and he relies on his parents for financial support and does not have any assets.  His family is middle class in Nigeria, which would not support their -- their income there would not support a middle class life-style here or the assets to provide to him to flee to Nigeria.  Mr. Ogoshi's father is a retired member of the Nigerian military.  He receives a pension.  His mother owns a small business selling soft drinks out of their apartment to their neighbors.

Mr. Ogoshi's entire family has never traveled outside of Nigeria and does not have passports.  They all live within Lagos, Nigeria, or the Nasarawa State, which is kind of in Central Nigeria.

Mr. Ogoshi has never used illicit drugs.  He has not used alcohol in years, and he is in good physical health and not -- does not have any mental health issues.  He and his family are christians.  They attend a local church in Lagos three times per week and he has attended that church for his entire life.

His family is tight knit.  We have been in close

contact with his brother in particular, who has been the

spokesperson for his family, but he is also close to his

parents as well.  His family remains supportive of him, as does

his -- well, his family remains supportive.

We are -- and as stated in our brief, we are seeking

release to a halfway house if he were released.  The Court

would be obligated to impose the specific conditions under the

Adam Walsh Act, and we have no objection to additional

conditions as the Court sees necessary, including that he not

be allowed to possess a cell phone or access to the Internet.

That's the category of information about Mr. Ogoshi

himself.  As far as information about where he might spend his

time, I also spoke to the pretrial services department about

where he might be placed.  We would be specifically requesting

Alternative Directions, but it would -- have no objection if

the Court placed Mr. Ogoshi in a different facility.  But I did

talk to U.S. Probation Officer Ben Schultz, who is here in

court today.  He provided me with information about Alternative

Directions and also provided me their current cell phone

policy.

What he did state, as the Court -- as I think the

Court is well aware, the Court could impose a condition that

Mr. Ogoshi not have Internet access or not have a phone while

on bond, and that condition could be monitored by Alternative

Directions.

1          Mr. Ogoshi would have a case manager at Alternative

2     Directions.  At least one of the current case managers there is

3     a former United States Probation Officer.  That case manager

4     would know his bond conditions, and his bond conditions could

5     be conveyed to other staff within Alternative Directions.

6          Alternative Directions does have a cell phone policy

7     that says that all probations and parole stipulations still

8     apply, i.e., phone restrictions, to contact orders, et cetera.

9     So I am not sure if I completely understood the government's

10    argument about the ability of probation or pretrial services to

11    restrict cell phone use through conditions of bond, but to the

12    extent that the Court imposes a condition that he cannot have

13    Internet access or cell phone use, Alternative Directions would

14    be able to honor that condition.

15         Additionally, I have some case information about other

16    cases where the government has not opposed bond in an extortion

17    case, and then a child pornography case.  I think that

18    information I provided to the government is probably better

19    left for argument, but I can go into that information now if

20    the Court wants to hear it.

21         THE COURT:  No.  You can wait for argument.

22         MR. TILTON:  Thank you.

23         THE COURT:  Ms. Kelly, before I hear from you,

24    Mr. Reust, can't I impose a condition that the Defendants not

25    have phones at AD?

1          MR. REUST:  You can impose that condition, Your Honor.

2     As the government states in its brief, the Court then basically

3     has to hope that that is followed by the Defendants, and these

4     are Defendants that learned about, you know, a child taking his

5     own life because of their blackmail and continued to do it.

6          Additionally, I would just say even in Alternative

7     Directions, at any pretrial release facility there is no way

8     for the facility administrators to watch the Defendants 100

9     percent of the time.

10          And last, something I don't raise in the brief but

11     that I thought about some since writing it, is I think there is

12     a serious risk just that the Defendants pose of blackmailing

13     the other releasees or other people at these facilities.  These

14     are the Defendants who disregarded the life and the loss of

15     life of a young child, and they did this because they wanted

16     money very bad.  There is no reason to believe that they would

17     not be willing to extort other releasees to obtain money that

18     they would otherwise have no way to obtain.

19          THE COURT:  Thank you, Mr. Reust.

20          Ms. Kelly?

21          MS. KELLY:  Thank you, Your Honor.

22          I'll try not to duplicate all the information that

23     Mr. Tilton just provided by the Ogoshi family.

24          THE COURT:  Thank you.

25          MS. KELLY:  But with respect to Samson Ogoshi I'll

1    also rely on the pretrial services report that was written.  I

2    submitted an Exhibit A that was a documentation that Simian

3    Ogoshi provided in regards to Samson's educational record.  I

4    also would note that Simian Ogoshi is -- has joined the Court

5    here in watching the proceedings from Nigeria as a supportive

6    family member.

7         Samson Ogoshi is 20 years old.  He also has no prior

8    criminal history.  No run-ins with any sort of legal issues.

9    He did graduate from secondary school and was preliminarily

10   accepted into the same college that Samuel was attending.

11   Simian also attended that same college and graduated with

12   honors.

13        Samson has never traveled outside of Nigeria.  No one

14   in the family has traveled outside of Nigeria.  Samson has no

15   relatives in the United States.  Samson has no reported health

16   issues, no mental health issues, no children, and has never

17   used any controlled substances.  He also is a member of the

18   church that the family goes to, and has been a dutiful son to

19   his family.  He was living at home at the time of his brother's

20   arrest.

21        Samson also was told to report to the EFCC.  I am

22   getting additional information that that was on January the

23   24th.  Samson did appear at the EFCC as told, and apparently

24   participated in investigations and statements there.

25        Samson has not had any disciplinary issues since his

1    arrest.

2         Getting to the point that Mr. Reust just brought up,

3    he has had the opportunity now for nine months to do some sort

4    of extortion and he hasn't, so I don't think that that would

5    change.

6         He has no income or financial support, has no

7    passport, no travel document.  He has no way to -- to get out

8    of the country.  His family also do not own passports so they

9    have no way to get into the country.

10         I am also, on behalf of Samson, requesting this Court

11    to release him to a halfway house.  I think that would be

12    appropriate with any other conditions that this Court would

13    want to add, including a tether, including no contact on a cell

14    phone, and -- and not having that access to the cell phone.  I

15    think that is easily monitored by Alternative Directions.  I

16    certainly have been present for supervised release violations

17    where someone has access to a phone and they shouldn't at

18    Alternative Directions.  So certainly I think that that is

19    something they can monitor closely.  And with that, I will

20    submit and then save my argument.

21         THE COURT:  Thank you.

22         MS. KELLY:  Thank you.

23         THE COURT:  Mr. Reust, argument?

24         MR. REUST:  Your Honor, the Defense in this case

25    evidenced a complete disregard for human life, in this case,

1    specifically the life of a 17 year old boy.  They learned about

2    his death.  We know not only from what they told police but

3    also from Samuel Ogoshi's search history where he is Googling

4    and trying to find out more information about that, and we know

5    that after they learned about the victim 1's death they

6    continued to engage in the exact same kind of activity that led

7    to victim 1's death.  They went back to sextorting men and

8    young boys so that they could obtain more money.

9          Yes.  The Defendants argue that their goal here was to

10   obtain money, but to get that money they were willing to go to

11   any -- any extreme necessary to get it, and there are simply no

12   conditions that the Court could place at Alternative Directions

13   or any other facility that would protect the community here in

14   West Michigan from the danger that they pose.  They knew about

15   this death and continued to engage in the exact same kind of

16   conduct.

17         Additionally, the thing that Ms. Kelly stated at the

18   end of her proffer just confirms that Alternative Directions

19   just simply doesn't have any way to make sure that the people

20   that are there never get access to a phone.  There are

21   violations of that policy and Alternative Directions has to

22   respond to that.  I think all of us have been present for

23   supervised release violations and different things where that

24   has been a case and -- and an allegation.  So there is simply

25   no condition the Court could place that would keep them from

1     getting access to those devices.

2           And with the device, with an electronic device that

3     are Internet capable, these Defendants could engage in the same

4     exact same kind of sextortion that they engaged in before.

5     There is no reason to believe that they wouldn't or that they

6     couldn't.  All it would require is an Instagram account, which

7     isn't difficult for them to get and to use.

8           Additionally, Your Honor, I think every factor that

9     the Court is supposed to consider -- consider under 3142 also

10    indicates that the Defendants pose a serious risk of

11    nonappearance.  Both of the proffers that we just heard from --

12    about both Samuel and Samson indicate that they have no ties to

13    this community.  They have no family in this community.  Yes,

14    they have no money, but -- and they don't have the ability

15    necessarily to get back to Nigeria, but they have every reason,

16    knowing that they are facing, in Samuel's case, potential

17    mandatory minimum sentence of 30 years, and in Samson's case a

18    potential mandatory minimum sentence of 15 years, they have

19    every reason to flee and to just disappear, being free

20    somewhere in the United States where they could return to

21    blackmail.  Obviously, they couldn't have real employment

22    because they don't have papers.  Free to blackmail and to make

23    money and to not be in custody.

24          So Your Honor, in the United States position these

25    Defendants both pose a serious danger because of the complete

1    disregard that they had for the life of a boy in West Michigan

2    that took his own life, and continuing to engage in that

3    conduct, and they pose a significant risk of nonappearance for

4    the very reason that they can have absolutely no ties to

5    Western Michigan.  They are not here because they wanted to be.

6    They are here so that they can face trial, so that they can

7    face the accusations that have been brought against them.

8    Thank you, Your Honor.

9            THE COURT:  You are welcome.

10           Mr. Tilton?

11           MR. TILTON:  Thank you, Your Honor.

12           Your Honor, I think it's important to -- to start with

13    the standard here that the Court must evaluate whether or not

14    to -- to grant release, because I think in the government's

15    argument it was applying a higher standard than -- than

16    actually applies.  The statute says the judicial officer shall

17    order the pretrial release of the person subject to the least

18    restrictive further condition or combination of conditions that

19    such judicial officer will reasonably assure -- or excuse me,

20    judicial officer determines will reasonably assure the

21    appearance of the person as required and the safety of any

22    other person in the community.

23           So the standard here isn't whether Alternative

24    Directions has always been able to prevent every single person

25    from possessing a cell phone.  The standard is whether the

1    condition will reasonably assure the appearance of the person

2    as required and the safety of any other person in the

3    community.

4         While this is a presumption case, the burden of

5    persuasion remains with the government, and I think here the

6    presumption is easily rebutted.  As the Court is aware, it's a

7    relatively light burden.  Mr. Ogoshi has no prior arrest or

8    convictions.  He is in his second year of college.  He has ties

9    to his local community and a history of being involved in his

10   local church.  He cannot flee.  He doesn't have the documents

11   to flee.  He doesn't have the money.  He doesn't have any

12   contacts in the United States or family that would be able to

13   assist him in fleeing.

14        I think that this is also a complicated offense, so

15   when we move into the 3142(g) factors, and we start to talk

16   about the nature and the circumstances of this offense, I don't

17   think the government is appropriately characterizing how it

18   alleged that this offense occurred.  It's not a simple offense

19   that occurred simply with a phone and an Instagram account.

20   The government alleged that six -- six individuals were

21   involved.  One individual had to go and hack the social media

22   accounts.  That individual would then sell the social media

23   accounts.  The government alleges that Samuel, Samson and

24   others purchased those accounts.  Then there is alleged to be

25   someone who provided financial support to all the people

1    involved here.

2         It wasn't as simple as the government alleges that

3    someone pay this extortion money and it goes right into

4    Ogoshi's bank account.  The government alleges that there was

5    an individual in the United States who had to receive the

6    money, send it to this middleman person who the government has

7    identified to the Nigerian authorities.  We -- we identified

8    that person based on government records as FE in our brief.

9    That person had to convert the money to cryptocurrency and then

10   eventually converted it to Nigerian currency.  So this isn't an

11   offense where someone can go out and simply get a phone and

12   immediately commit an offense in the way the government alleges

13   that it was committed here.

14        There is no indication, based upon the record, that

15   any of the Defendants here were blackmailing people in person

16   as the government alleges that Mr. Ogoshi could do at the

17   halfway house.  I am not really sure what and the means of that

18   blackmail would be and how Mr. Reust believes that -- that

19   Samuel Ogoshi would go out and do that at the halfway house,

20   but there is no indication on the record of any similar

21   activity in the past.

22        I think that when we look at the nature of this

23   offense under 3142(g)(1), I think the Court should also

24   consider that as far as the penalty enhancement is here, it's

25   sort of a novel theory about the government.  Mr. Mekaru said

1    at the initial appearance that he was not aware of anyone being

2    punished previously under this theory where -- where the

3    alleged victim committed suicide, and so I think that

4    Mr. Ogoshi does have reason to stick around and participate in

5    his trial.

6          Additionally, this is an -- ultimately a financial

7    offense.  The Court took issue at the last hearing with the

8    government's characterization of it as a sextortion case,

9    because ultimately it's an extortion case.  It's a case that's

10   alleged to be -- was committed for money, and it's different

11   from cases under the same statute where the offense was alleged

12   to be committed for sexual gratification, because I think those

13   types of Defendants have a higher rate of recidivism or would

14   be more likely to recidivate than Defendants in this situation.

15         And I would just note that in a similar case where the

16   government alleged that there were 270 victims in this district

17   of sextortion that was committed for sexual gratification, in

18   that case, the government, on its own motion, made a bond

19   that -- made a motion to release the person on an appearance

20   bond, and that was the Brandon Le case that Judge Jonker just

21   sentenced last week.  So I don't think that the nature of this

22   offense on its own suggests that there needs to be pretrial

23   detention.

24         I think when we look at the weight of the evidence

25   against the person where the weight goes to dangerousness, not

1    the weight of his guilt, I think that signs point that

2    Mr. Ogoshi is unlikely to engage in criminal conduct while on

3    bond.  It's a complicated case.  He won't have the means of

4    committing the offense while in a halfway house.  The halfway

5    house can observe his conduct, can watch him and can reasonably

6    assure that he will not possess a cell phone there.  Again, he

7    won't have the financial means to purchase one and he wouldn't

8    have the means to commit the offense.

9          Mr. Ogoshi's history and characteristics, while are

10   not tied to this country, I think suggest that he is a person

11   who has been a person of character, and that I don't think that

12   the fact that those ties are to Nigeria should weigh against

13   him here, because they show that he is someone who can't --

14   well, let me put it this way.  It's not -- it's not like he can

15   flee back to Nigeria to escape prosecution here.  He is in a

16   foreign country that he has never visited before.  The

17   government and the Court can monitor him by placing him at a

18   halfway house and on location monitoring so they'll know where

19   he is at all times.  If he were to cut off that location

20   monitoring, probation would know, and I don't think he would

21   get very far.  So I don't think the risk of nonappearance on

22   his own volition is high here.

23         The government and -- and obviously we take issue with

24   what role an ICE detainer plays here.  I don't think that there

25   is binding authority on the Court in how to weigh or to

1    consider whether or not to consider that ICE detainer, but I do

2    think that there are a number of cases, including the cases in

3    the Sixth Circuit that say the Bail Reform Act and immigration

4    operate separately and the statutes that govern them are

5    separate statutes and operate independently.

6         I do think it's -- it's worthwhile noting that the

7    government cited the United States v Valadez-Lara case in its

8    brief for the proposition that the Court should consider the

9    ICE detainer in determining Mr. Ogoshi's risk of nonappearance.

10   However, I -- I think the -- the reliance on Valadez-Lara is

11   actually favorable to the Defense there, because the Court

12   there held that, well, while it may be a factor for

13   consideration that other courts have cautioned that the

14   existence of an ICE detainer does not allow the Court to

15   speculate on the eventual results of immigration proceedings,

16   and the Court then held, therefore, when considering

17   Defendant's eligibility for release, the Court will assess

18   whether an immigration detainer could at -- sorry.  The Court

19   will assess defendant's intentional risk of nonappearance and

20   not whether an immigration detainer could at some point in the

21   future result in his removal.  So in Valadez-Lara case, the

22   court actually only considered intentional risk of

23   non-appearance, which is what we think the Court should

24   consider here.

25        And I think I am going to say one -- or quote one

1    other case, which is a district court in the Northern District

2    of Ohio, citing another case out of Minnesota, and that's the

3    United States v Arnodo-Mercado.  The Westlaw cite is 2023,

4    Westlaw 2633543, and it said, this Court and many others have

5    long declined to use the government's own decision to remove an

6    alien during the pendency of his criminal prosecution to

7    preclude release.

8         The problem here is not that the Defendant will absent

9    himself from the jurisdiction, but the two Article II agencies

10   will not coordinate their responsive efforts.  This Court ought

11   not to run interference for the prosecuting arm of the

12   government.  Put another way, the fact that ICE will not agree

13   or cannot be trusted to delay deportation, that separate

14   agencies within the executive branch do not communicate and

15   cooperate cannot serve to deprive a Defendant his rights under

16   the Eighth Amendment and the Bail Reform Act.

17        So I would ask the Court to consider that authority

18   and not consider the immigration detainer or Mr. Ogoshi's

19   immigration status in making a decision under the independent

20   Bail Reform Act.

21        I think looking at all of the factors that the Court

22   must consider under 18 United States Code 3142, I think he has

23   rebutted the presumption.  I think that 34 -- 3142(g) factors

24   favor in -- weigh in favor of release, and we would ask for

25   release to a halfway house under conditions required by the

1    Adam Walsh Act and condition that he not be allowed to possess

2    a phone or access the Internet or any other conditions the

3    Court deems appropriate.

4          THE COURT:  Thank you, Mr. Tilton.

5          Ms. Kelly?

6          MS. KELLY:  Thank you.  Thank you, Your Honor.  And

7    again, I'll try not to duplicate the efforts from Mr. Tilton.

8          In order to rebut the presumption Mr. Samson Ogoshi

9    needs to produce some evidence that he will not flee or

10   endanger the community if released.  I have talked about -- in

11   my proffer about the issue about fleeing.  I think the fact

12   that Samson turned himself in voluntarily, he was not arrested,

13   he went to the EFCC knowing that his brother had been arrested

14   a week prior on the allegations, willingly talked, apparently,

15   with the EFCC and the FBI, I think there are conditions that

16   this Court could place on him, including the halfway house,

17   including a location monitoring, to ensure that he is not able

18   to flee.

19         Obviously, I have talked about he has no documents to

20   travel.  He has no money to travel.  He has no access to

21   travel, nor does his family have that money or access to do so.

22         Samson has no prior arrests or convictions.  He has

23   completed secondary school, which would be high school here.

24   He has had some apprenticeships, had some skills, and was

25   accepted into college.

1    In relation to the endangering the community if

2    released, again, Mr. Samson Ogoshi and Samuel Ogoshi have now

3    been in custody since January, have had no incidents with other

4    members of those that are in detention.  No issues related to

5    me from any of the arresting agencies that Samson has had any

6    problems.

7    The government, in their brief, talked a bit about the

8    allegations and related -- in relation to Samson.  Samson is

9    not charged in Count 1, as this Court knows, but the government

10   proposes that Samson on the same date of 3-25 to 3-6 also

11   mentioned, I am going to make you commit suicide.  And I just

12   wanted to -- to note for the Court, as the -- the government

13   has stated in their brief, the alleged search of the Michigan

14   suicide, that was on April the 1st.  So you have these two

15   conversations that are allegedly going on on the dani.robertts

16   account on the same day.

17   Samson was asked by the authorities, both by EFCC and

18   by the FBI, which is in the exhibit, did he ever say, did you

19   commit suicide?  Samson was shown text messages from the FBI,

20   which is in the exhibit of his interview, and he said on the

21   recording, it's not in the report, on the recording he said, I

22   didn't text that.

23   Now, I have not looked at all the discovery.  The

24   government has allowed us to come over and -- and review some

25   of it.  I am sure that if there was some statement that Samson

1    made after April the 1st about committing suicide or using

2    language like that, I am sure it would have been in an exhibit

3    here in front of the Court.

4        Mr. Reust talked about there was someone communicating

5    with a girlfriend.  Again, I don't have those text messages.  I

6    don't know those dates.  The earliest date that I have is the

7    date provided by the government, which would be April the 1st,

8    which is when the searches take place.  So I don't have

9    anything after that that's related to Samson and those

10   statements like that.

11       Also, in Exhibit 8, Samson told the FBI agents

12   allegedly that they -- they were targeting colleges and

13   universities in the United States.  Not high schools, not

14   middle schools, but searching for colleges and universities,

15   talking about programs and studies that they were doing in

16   college, not looking for minors.  And I know Mr. Reust has said

17   that there were additional photos of minors.  I don't have that

18   discovery yet.

19       When Samson was interviewed by the FBI in February,

20   again, without a lawyer present, so this would have been the

21   fourth time that he was interviewed without a lawyer present,

22   when he is reviewing that advice of rights form, which is

23   submitted to this Court as an exhibit, Samson, two minutes into

24   the interview, says, but maybe some few questions if I can't --

25   I am not able to answer I'll need to get advice from my

1    lawyer -- or a lawyer.  Excuse me.  And then he was interviewed

2    for another hour and-a-half by FBI agents.

3    Samson also talked about Forex exchanging that he was

4    doing with FBI agents, other work that he was doing, instead of

5    continuing to allegedly commit this crime.  But when, again,

6    asked by the agents if he sent those messages on March the 25th

7    into the 26th to victim 2, who is 21 years old, he adamantly

8    said no.

9    I agree with Mr. Tilton that this is a complicated

10   case.  It is not as simple as Mr. Samson Ogoshi sending a

11   message and receiving the money right back.  As Mr. Tilton

12   mentioned, there were, at the request of the FBI, six people

13   that were to be arrested in January of this year that were

14   related.  Others that were in charge of getting the hacked

15   accounts.  Others that were charged of the finances.  There is

16   a portion in these statements where Mr. Samson Ogoshi talks

17   about receiving a portion of -- for what he did.

18   But with relation to the danger to the community, I

19   think Samson has shown that he can be trusted.  That he is not

20   a danger to the community in West Michigan.  He will not have

21   access to a phone.  He has no access to money or finances.  I

22   agree with Mr. Tilton that the -- the Bail Reform Act does not

23   permit pretrial detention just based on an ICE detainer.  I

24   would note that in the Fifth Circuit in the United States

25   versus Baltazar-Sebastian, which is 990 F.3d 939, it is a 2021

1    case under 8 CFR § 215(a)(2) an alien shall not depart the

2    United States if her departure would be prejudicial to the

3    interests of the United States.  As a party to a pending

4    criminal case an alien's departure is deemed prejudicial.  8

5    CFR section 215.3(g).  The departure is not prejudicial,

6    however, if the appropriate prosecuting authority provides

7    consent.  I would not expect the prosecuting authority here to

8    provide consent that Mr. Samson Ogoshi or Samuel Ogoshi be

9    deported pending these judicial proceedings.

10            I think the 3142(g) factors do -- would weigh in favor

11   of Samson Ogoshi.  He acknowledges the charged offense is

12   serious, but again, the purpose of the alleged conspiracy is

13   for financial gain.  He has no prior criminal history.  He

14   voluntarily surrendered to the authorities.  He has been in

15   custody since January without incident.  No history of

16   controlled substance use or possession.  Twenty years old.  He

17   will be 21 in November.  Soon to be a college student.  No

18   prior criminal history.  He has some work experience.  He

19   understands that he will be subject to certain terms and

20   conditions if released by this Court, including a tether,

21   including location monitoring, including no phone, and we would

22   be asking for that release.  Thank you.

23            THE COURT:  Thank you, Ms. Kelly.

24            Mr. Reust, some very brief rebuttal argument?

25            MR. REUST:  Yes, Your Honor.

1          Your Honor, I want to -- I'll go briefly through

2    things as they were presented.  I think both counsel spoke

3    about how this was a complicated scheme, and, you know, parts

4    of this scheme were indeed complicated, but the part that was

5    blackmail is the part that matters here, and it's the part that

6    both Defendants know how to do and did and returned to after

7    learning about victim 1's death.

8          Samuel's counsel refers to the ties to the Nigerian

9    community as being irrelevant, but the statute asks about the

10   length of residence in the community being the community of

11   prosecution.  It's not asking about the -- the length of time

12   that somebody has lived in a community in a foreign country.

13   So the focus should be on the ties to West Michigan.  That's

14   what gives somebody an incentive not to leave West Michigan and

15   to appear for hearings in West Michigan, not the ties that they

16   might have to Nigeria.

17         Both counsel speak about an ICE detainer alone not

18   being enough, and, you know, I might agree with that.  That's

19   not the primary reason why the government believes that these

20   Defendants are a risk of nonappearance.  But in addition to

21   that, there is more than an ICE detainer here.  There is

22   Exhibit 9, which is the affidavit from the person that would be

23   responsible for enforcing this, and who is saying that if they

24   were released, in fact, not only is there a detainer but they

25   would be placed in custody, and -- ICE custody, and they would

1    be deported.  And I'd note, you know, as I do in the brief,

2    that it's not just ICE saying that that's what should happen

3    here.  It's Congress that said it in the relevant statutes as

4    well.  Congress has said, not just the executive government or

5    the executive branch of the government, that these Defendants

6    should not be release and if they are they should be detained

7    and deported.

8              And then Ms. Kelly, you know, acknowledges or states

9    that Samson said he self-reported or that he did self-report to

10   police, the EFCC, but her brief further states that he did that

11   at least because he was told that the police would let both him

12   and Samuel go if he did.  It's not unusual for police even in

13   the U.S., you know, to create some kind of a Ruse to get

14   someone to self-report like that, and those were the conditions

15   under which Samuel reported there.

16             I just return to the fact that the Defendants in this

17   case have shown that they are a danger to this community.  They

18   showed that after they did that they returned to the same kind

19   of activity they had been engaged in that led to the problems

20   that they caused in this community, and there are no conditions

21   that this Court can place on them that will reasonably assure

22   their appearance and that will keep this community safe, Your

23   Honor.  Thank you.

24             THE COURT:  Thank you, Mr. Reust.

25             The Court's consideration of bond begins with the

1    Eighth Amendment to the United States Constitution, which
2    prohibits excessive bail.  The Eighth Amendment's protections
3    are made statute in the Bail Reform Act beginning at 18 United
4    States Code § 18 United States Code § 3141, § 3142 of which
5    requires the Court to release a Defendant on bond unless the
6    Court concludes that there is no condition or combination of
7    conditions that will reasonably ensure the Defendant's
8    appearance and the safety of the community.  Certain federal
9    crimes give rise to a presumption in favor of detention.  This
10   is one of them.
11        § 3142(g) of the act lays out the specific factors
12   that I am to consider in reaching my decision.  Those include
13   the nature and circumstances of the offense, specifically
14   whether it involves a crime of violence, which this offense is
15   classified as, am I not right, Mr. Reust?
16        MR. REUST:  That's correct, Your Honor.
17        THE COURT:  The weight of the evidence against the
18   Defendants is the second factor.  I would say that there is
19   substantial evidence against both Defendants.  There may be
20   questions about how that -- some of that evidence was
21   collected, but at the end of the day, this factor is accorded
22   the least weight in my analysis for bond because both
23   Defendants are still cloaked with the presumption of innocence.
24        The -- the weight of the evidence is also more
25   difficult for me to assess here because the government is

1    pursuing a novel application of the facts of this case to the

2    statute.  So we don't have -- I, at least, don't have any way

3    to assess the likelihood of success as the case moves forward,

4    I mean, based upon case law.  Other factors, the history and

5    characteristics of the Defendant, including character, physical

6    and mental condition, family ties, employment, resources,

7    education.

8         As Mr. Tilton and Ms. Kelly have covered in detail, so

9    I am not going to go through it in the same detail they did,

10   both of these Defendants were born and raised in Nigeria --

11   Nigeria in Lagos.  Both have essentially lived with their mom

12   and dad their entire lives.  The parents, married for a long

13   time.  Dad retired from the Nigerian military.  Mom runs an --

14   essentially a food cart selling soft drinks in her neighborhood

15   to support the family.

16        The family is close.  They are religious, go to church

17   three times a week.  It was a good environment.  Both of these

18   Defendants were good students, did well in high school.  Both

19   accepted into college.

20        And I would note for the record that the government,

21   in some of its briefing, refers to the victim in this case as a

22   boy, which he was, but the Defendants are a little more than

23   boys themselves, and terrible and tragic decisions were made in

24   this case, and at the end of the day at what seems likely to me

25   is that two families are going to be destroyed as a result of

1    the events underlying this case, and that is very sad.

2         Let's see, as to Samuel, he is 23 now.  As Mr. Tilton

3    laid out, single, doesn't have any children, no criminal

4    record, has never been arrested, never been in trouble as far

5    as we know for anything.  Doesn't have a passport.  Has never

6    traveled outside of Nigeria.  In fact, no member of his family

7    has ever traveled outside of Nigeria.  As a student, doesn't

8    have any income expenses, assets or liability.  Liabilities, he

9    is completely financially reliant on his parents.

10         His physical health is good.  Mental health good.

11         Samson's story much the same.  Obviously raised in the

12   same household with his two brothers.  Lives -- lived with his

13   parents his whole life.  He is 20 now.  Also single, no kids,

14   no passport, never traveled outside Nigeria, no employment

15   history.  Was training to be a shoe cobbler.  No assets,

16   liabilities, income or expenses.

17         Physical health is good.  Mental health good.  He

18   reports that he drank alcohol one time.  Also no criminal

19   history.  No arrests.

20         Other factors that I consider in reaching my decision,

21   I would include the ICE detainer among those.  I am not

22   persuaded by the government's argument with respect to the ICE

23   detainer.  The government, and I don't know if it's Agent

24   Osborne.  Let me pull up his -- Assistant Field Director

25   Osborne, in his declaration, argues, or says, attests to the

1    fact that these Defendants would be removed if I released them.

2              In its sentencing, or in its bond memorandum, oops,

3    the government argues and Mr. Reust argued from the podium a

4    moment ago that Congress has directed ICE to detain and deport

5    Defendants if they are released on bond.  To that I would say

6    this.  Congress also enacted the Bail Reform Act, which

7    includes a presumption of release.  Congress enacted the

8    statute under which you charged these Defendants.  Congress

9    provided for the enhanced penalty scheme that you are seeking

10   to enforce here apparently for the first time.  If there is a

11   problem in that system, it's Congress that needs to fix it.

12   Not the Court.  I am not taking a side.  When the government is

13   arguing essentially against itself, two branches of the

14   executive branch have a disagreement, it's Congress's to fix.

15   So the existence of the ICE detainer will play no role in my

16   decision and I give it no weight.

17             Let's look, then, at the two issues at play here.

18   First, a danger to the community.  As I said earlier, the

19   government's burden of proof on that issue is clear and

20   convincing evidence.  A fairly heavy standard in the law.

21             I am equally unpersuaded by the government's arguments

22   that these Defendants pose a danger to the community in that

23   the government would have me believe if I release them they are

24   likely to continue in the same behavior that brings them before

25   the Court today.  I would say as a general matter it is

1    extremely unusual for a Defendant released on bond to continue

2    with the offense conduct that resulted in the charges in the

3    first place.  There are exceptions.  Drug sales being probably

4    the one I see most often.  But these two Defendants are plucked

5    from Lagos, Nigeria, flown half way around the world, separated

6    from their families, and landed here in Grand Rapids, Michigan,

7    which must seem like the far side of the moon to them.

8         They are facing potential life in prison.  Potential

9    long mandatory minimum sentences.  Their lives up to the time

10   they became involved in this scheme seemed to have been rule

11   following lives.  We have no evidence, no information to

12   suggest -- you know, there is no history of long supervision by

13   juvenile authorities in Nigeria or anything which would lead me

14   to believe that they are not able to follow orders given them

15   directly.

16        So -- and they also don't seem to me to be

17   unintelligent.  I think they appreciate the gravity of their

18   situation.  That's been my impression of them when I have had

19   them in Court in front of me.

20        And so I find the government has not met its burden

21   and it would be difficult, since the only reason we're here is

22   because the victim died, which is tragic, but if the victim

23   hadn't died my guess is we wouldn't be sitting in this

24   courtroom and these charges wouldn't have been brought.

25        The amount of money involved in the whole -- if we

1    look at the whole scheme, is minimal.  I doubt the United

2    States would have -- would have spent time and money pursuing

3    it otherwise.

4         So it's the tragic death of victim 1 that brings us

5    here.  I don't -- I am not persuaded that these Defendants

6    would do anything like this again.

7         Moving onto risk of nonappearance.  The Defendants

8    argue, you know, based upon their histories in Nigeria, that,

9    and some of the same factors that I have just laid out, that

10   they aren't a danger of nonappearance.  This is the more

11   troubling issue for me, because they are basically boys, and

12   they are halfway around the world separated from their

13   families, facing tremendous penalties if ultimately convicted

14   in this case.  They know no one here.  They have no way to

15   support themselves.  They aren't -- would not be allowed to

16   work in any lawful occupation in this country anyway.  They

17   have no support system.

18        The halfway houses -- there are problems at the

19   halfway houses.  Those of us who work with them regularly know

20   that.  I don't know that for these two Defendants Alternative

21   Directions, CAP or KPEP or any of those places would be safe or

22   appropriate for them.

23        And I can see, as young men, boys, panic as we get

24   down the trail in this case, flight, which ultimately would

25   prove futile, because nobody escapes the United States.  When

1    it commits its will to finding a person, a person gets found

2    and brought back, but I could see that happening, and when

3    things like that occur, there are all kinds of consequences

4    which can follow, and I don't want to see any of those kinds of

5    consequences come to pass.  There has been enough tragedy in

6    this case.

7            It's my finding, based on all the evidence, that the

8    government has met its burden of proving by a preponderance of

9    the evidence that these Defendants are a risk of nonappearance

10   in the case and for that reason I am ordering them held in

11   custody while the case is pending.

12           Mr. Reust, anything else from the United States?

13           MR. REUST:  No, Your Honor.  Thank you.

14           THE COURT:  Mr. Tilton?

15           MR. TILTON:  No, Your Honor.  Thank you.

16           THE COURT:  Ms. Kelly?

17           MS. KELLY:  No, Your Honor.  Thank you.

18           THE COURT:  We'll be adjourned.

19           (Proceeding concluded, 12:17 p.m.)

20

21

22

23

24

25

1                        C E R T I F I C A T E

2

3         I certify that the foregoing is a transcript from the

4    Liberty Court Recording System digital recording of the

5    proceedings in the above-entitled matter to the best of my

6    ability.

7

8

9

10                            /s/ _____

11                            Paul G. Brandell, CSR-4552, RPR, CRR

12                            U.S. District Court Reporter

13                            399 Federal Building

14                            Grand Rapids, MI  49503

15

16

17

18

19

20

21

22

23

24

25